UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

HENRY N. YOUNG,

                **Plaintiff,**

        **- against -**

NEW YORK CITY DEPARTMENT OF
EDUCATION, SYDNEY BLAIR, AND
CAROLYN PETERSON,

                **Defendants.**

------------------------------------------------------ X

**OPINION AND ORDER**

**09 Civ. 6621 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/13/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       Henry Young, a former probationary teacher with the New York City Department of Education ("DOE"), proceeding pro se, brings suit against the DOE, Sydney Blair, and Carolyn Peterson (collectively, "Defendants") alleging discrimination based on race and/or national origin, sexual harassment, and retaliation under Title VII of the Civil Rights Act ("Title VII"),[1] disability

---

[1]    *See* 42 U.S.C. § 2000-e *et seq.*

1

discrimination under the Americans with Disabilities Act of 1990 ("ADA"),[2] and libel.[3]

Specifically, Young claims Defendants discriminated against him by (1) transferring him six times; (2) conducting unannounced evaluations of his classes; (3) failing to address him as doctor and maintaining that he was an "odious African"; (4) "body-slamming" him; (5) denying him tenure; (6) failing to accommodate his disability; (7) rating him unsatisfactory for the 2007-2008 school year; and (8) terminating his employment.[4] Young further alleges that he was sexually harassed by Peterson and retaliated against for filing complaints about this sexual harassment.[5] Young also claims he was retaliated against when Virginia Caputo, Director of the DOE's Office of Appeals and Reviews ("OAR"), did not communicate the outcome of his administrative appeal of his unsatisfactory rating and termination.[6] Finally, Young asserts that a letter sent by Peterson to Blair on

---

[2]     See id. § 12102 et seq.

[3]     See Complaint ("Compl.") ¶¶ 1-15.

[4]     See id. ¶¶ 1-8.

[5]     See id. ¶¶ 14-15.

[6]     See id. ¶ 15.

2

March 25, 2008 constitutes libel.[7] Defendants now move for summary judgment on all of Young's claims. For the reasons set forth below, Defendants' motion is granted in full.[8]

## II. BACKGROUND[9]

---

[7] *See* Young Deposition, Excerpt 3 ("Young Dep. 3"), Ex. C to 5/9/10 Declaration of Alicia H. Welch, counsel to Defendants, in Support of Defendants' Motion for Summary Judgment ("Welch Decl.") at 108:12-20.

[8] At the outset, I note that neither Title VII nor the ADA allow for individual liability. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995) (Title VII), *abrogated on other grounds by Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998); *Hallett v. New York State Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 199 (S.D.N.Y. 2000) (ADA). The Title VII and ADA claims brought against individual defendants Blair and Peterson are therefore dismissed.

[9] Local Civil Rule 56.1(a) requires a party moving for summary judgment to "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Rule 56.1(b) requires the party opposing summary judgment to respond to the movant's statement with a correspondingly numbered statement. "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Rule 56.1(c). If the non-moving party controverts any statement, the non-moving party must cite to evidence that would be admissible at trial that shows that the controverted statement is in fact in dispute. *See* Rule 56.1(d); *see also Rodriguez v. Schneider*, No. 95 Civ. 4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999). Although Young's response to Defendants' 56.1 statement contains correspondingly numbered paragraphs, Young does not, with the exceptions of paragraphs 37, 41 and 44-45, identify any evidence in the record, or any evidence at all, to support his contention that certain facts are disputed. *See* Plaintiff's 56.1(b) Statement ("Pl. 56.1"). Further, many of Young's response paragraphs either do not specifically dispute

3

## A. Employment History

On August 25, 2003, Young received a "commitment letter" from the DOE indicating that he had been selected for a teaching position.[10] A commitment letter is a conditional offer of employment "subject to verification of eligibility for New York State Teaching Certification and a background check based on fingerprinting, past employment history and the information [the recipient has] provided."[11] If an individual does not meet the certification requirements or fails the background check, then the individual will not be hired as a teacher.[12] When Young received his 2003 commitment letter, he did not have a New York State

---

Defendants' statements or consist of "conclusory allegations, speculation or conjecture." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996). Accordingly, I deem Defendants' 56.1 statement admitted by Young, except insofar as Young disputes statements made in paragraphs 37, 41, and 44-45. Nevertheless, in light of the more lenient standards applied to the pleadings of pro se litigants, *see Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam), I consider Young's disputed statements to the extent that they might be material to the outcome of this motion.

[10]     *See* 8/25/03 Letter from Joyce Coppin, Chief Executive, DOE Division of Human Resources, to Young ("Commitment Letter 1"), Ex. O1 to Welch Decl.

[11]     *Id.*

[12]     *See* 4/23/10 Declaration of Peter Ianniello, Deputy Executive Director, DOE Division of Human Resources, in Support of Defendants' Motion for Summary Judgment ("Ianniello Decl.") ¶ 5.

4

Teaching Certification.[13]  As such, Young was not appointed to a teaching position

as a result of his first commitment letter,[14] although he did work as a substitute

teacher from September 2 to October 20, 2003, until the DOE realized he did not

have a New York State Teaching Certificate.[15]  Substitute teaching is not a

probationary appointment, and therefore cannot lead to a tenured teaching

position.[16]

On February 1, 2004, Young acquired a Provisional Certification in

Special Education based on certification from another state or country,[17] which

constitutes a valid New York State Teaching Certification.[18]  Young received a

---

[13]     *See id.* ¶ 6.  The "Area of NYS Certification" is blank on Young's
first commitment letter, further indicating that he did not have a New York
Teaching Certification at the time.  *See* Commitment Letter 1.

[14]     *See* Ianniello Decl. ¶ 6.

[15]     *See id.* ¶ 7.  In his response papers, Young contends that this initial
offer was not merely a commitment letter, but "a letter of employment as a
teacher."  Pl. 56.1 ¶ 6.  Young also contends that he never worked as a substitute.
*See id.* ¶ 7.

[16]     *See* Ianniello Decl. ¶ 7.

[17]     Young testified that he was certified to teach in New Jersey and
Texas.  *See* Young Deposition, Excerpt 2 ("Young Dep. 2"), Ex. B to Welch Decl.
at 55:1-13.

[18]     *See* Ianniello Decl. ¶ 6.

second commitment letter on September 7, 2005,[19] and was appointed as a probationary teacher at Passages Academy – a school for middle and high school youths detained at facilities operated by the New York City Department of Juvenile Justice.[20]

For the 2005-2006 and 2006-2007 school years, Young was supervised by Passages Academy Principal Blair and Assistant Principal ("A.P.") for Special Education Howard Pettus.[21]  Both Blair and Pettus worked out of the Passages Academy Administrative Center, not at the sites where Young taught.[22] Blair rated Young's performance satisfactory for both 2005-2006 and 2006-2007.[23]

### B.      2007-2008 School Year

During the 2007-2008 school year, Young taught at Bridges, a

---

[19]      See 9/7/05 Letter from Ianniello to Young ("Commitment Letter 2"), Ex. O2 to Welch Decl.

[20]      See 4/26/10 Declaration of Sydney Blair, former Principal, Passages Academy, in Support of Defendants' Motion for Summary Judgment ("Blair Decl.") ¶ 1.

[21]      See id. ¶ 4.

[22]      See id. ¶¶ 1, 4.

[23]      See 6/15/06 Young's 2005-2006 Rating Sheet ("2005-2006 Evaluation"), Ex. D2 to Welch Decl.; 6/10/07 Young's 2006-2007 Rating Sheet ("2006-2007 Evaluation"), Ex. D1 to Welch Decl.

Passages Academy site in the Bronx.[24]  For the first time in his probationary period

Young was supervised by an A.P., Peterson, who supervised employees at only one

Passages site.[25]  Peterson interacted with Young on a daily basis and had numerous

opportunities to observe his performance.[26]

On September 6, 2007, Peterson conducted a walk through of

Young's class.  In her Log of Assistance she noted that she observed,

> [s]tudents talking and walking around, no evidence of a lesson
> being taught, no Passages Academy heading on board or
> handouts being given, no textbooks on desk for student, no law
> and ethics curriculum being used, no homework being given to
> students.[27]

Peterson conducted at least a dozen of these walk throughs over the

course of the 2007-2008 school year.[28]  On each occasion, Peterson made similar

observations to those made on September 6, 2007.[29]  Peterson recorded multiple

---

[24]     *See* Blair Decl. ¶ 6.

[25]     *See id.*

[26]     *See id.*

[27]     Log of Assistance for Henry Young ("Log"), 9/6/07, Ex. E to Welch
Decl. at 1.

[28]     *See id.* at 1-7.

[29]     *See id.*

instances in which (1) students were talking and walking about;[30] (2) there was no evidence of a lesson being taught;[31] (3) the classroom was disorganized;[32] (4) no homework was given;[33] (5) classroom incidents were unrecorded;[34] and (6) Passages Academy policies regarding attendance, the Pledge of Allegiance, headings on the board, textbooks, and/or homework assignments were not followed.[35]  On one occasion Peterson observed that the "writing on the board [was] from right to left."[36]  Peterson also recorded several arguments between Young and an educational paraprofessional, Warren Bailey, who had been assigned to assist Young with lesson planning.[37]  Finally, Peterson recorded that students were refusing to attend Young's class and that several had complained that Young

---

[30]    *See id.* 9/6/07, 9/7/07, 9/10/07, 9/19/07, 11/14/07, 11/26/07, 12/7/07, 2/4/08 at 1-4.

[31]    *See id.* 9/6/07, 9/7/07, 9/10/07, 9/19/07, 11/14/07, 11/26/07 at 1-2.

[32]    *See id.* 9/10/07, 12/7/07, 2/4/08 at 1, 3-4.

[33]    *See id.* 9/6/07, 9/7/07, 9/10/07, 9/19/07 at 1.

[34]    *See id.* 9/19/07, 11/14/07, 2/4/08, 3/27/08 at 1-2, 4, 6.

[35]    *See id.* 9/6/07, 9/7/07, 9/10/07, 3/12/08, 3/20/08 at 1, 5; 3/5/08 Letter from Peterson to Young, Ex. F6 to Welch Decl.

[36]    *See id.* 10/12/07 at 2.

[37]    *See id.* 10/4/07, 10/17/07 at 1-2; Peterson Deposition ("Peterson Dep."), Ex. H to Welch Decl. at 21:17-22.

8

had an "odor."[38]

These incidents resulted in multiple conferences between Young and Peterson, in which Peterson discussed targets for improvement, offered advice for meeting these targets, and issued Young organizational materials to aid him in improving his teaching.[39]  Peterson also modeled lessons for Young several times,[40] and she appointed a buddy teacher, mentor, and paraprofessional to assist Young further.[41]

In addition to informal observations by Peterson, Young was formally observed on three occasions during the 2007-2008 school year.  On October 18, 2007, A.P. Pettus observed Young's Law and Ethics class and rated the lesson satisfactory.[42]  On December 18, 2007, Blair observed Young's Law and Ethics class and rated the lesson unsatisfactory.[43]  On March 25, 2008, Peterson and another A.P., Zulma Ortiz-Schumeyer, observed Young's Global

---

[38]   *See* Log, 12/7/07, 2/4/08, 3/27/08 at 3-4, 6; 3/25/08 Letter from Peterson to Blair, Ex. M1 to Welch Decl.

[39]   *See* Log at 1-6.  The organizational materials were reissued after Young could not find the first set. *See id.* 12/12/07 at 3.

[40]   *See id.* 11/14/07, 11/26/07 at 2.

[41]   *See* 9/17/07 Letter from Peterson to Blair, Ex. F2 to Welch Decl.

[42]   *See* 10/18/07 Letter from Pettus to Young, Ex. F3 to Welch Decl.

[43]   *See* 12/18/07 Letter from Blair to Young, Ex. F5 to Welch Decl.

History/American History class and rated the lesson unsatisfactory.[44]  Blair,

Peterson, and Ortiz-Schumeyer noted, among other things, that Young was

disorganized, that students were unengaged and confused, and that the lesson's

learning objectives were not evaluated.[45]

Throughout the 2007-2008 year, Blair and Peterson recorded multiple

instances in which Young failed to comply with Passages Academy policies

regarding grading.[46]  On February 25, 2008, Blair noted that Young had failed to

maintain daily records for each category of assessment of student performance, as

Passages Academy policy requires.[47]  On March 17 and 18, 2008, Young requested

assistance in entering grades by computer, and Peterson scheduled two training

conferences to assist Young in submitting his grades.[48]  On March 19, 2008, the

---

[44]     See 3/25/08 Letter from Peterson and Ortiz-Schumeyer to Young, Ex. F7 to Welch Decl.

[45]     See id.; 12/18/07 Letter from Blair to Young.

[46]     Young disputes most of Defendants' statements regarding grading, but his objections consist of conclusory allegations that Blair demanded that he keep precise grading records as a trap and that she conspired with the Passages computing staff to block him from entering his grades.  See Pl. 56.1 ¶¶ 50-55.

[47]     See 2/25/08 Letter from Blair to Young, Ex. G1 to Welch Decl. Around this time, Young also began refusing to sign the letters placed in his file. See id.

[48]     See Log, 5/17/08, 5/18/08 at 5.

day after grades were due, Young called in sick without having submitted his grades.[49]

Finally, Young violated Passages Academy policy regarding absences from school grounds during the day.[50]  Passages Academy Timekeeping Policy provides that "if you leave the school building during the day, you must get permission from your site supervisor, write the time you are leaving in the [designated] book, and write the time you returned in the book."[51]  Young left the school without permission on December 21, 2007, January 22, 2008, and January 25, 2008.[52]

### C.    Unsatisfactory Rating and Termination

On April 4, 2008, Blair rated Young unsatisfactory for the 2007-2008

---

[49]    *See id.* 3/19/08 at 5; Blair Decl. ¶¶ 10-11.  Young contends that he never received any training. *See* Pl. 56.1 ¶ 55.

[50]    *See* Log, 12/21/07, 1/22/08, 1/25/08 at 4.

[51]    Passages Academy Timekeeping Policy, Ex. J1 to Welch Decl.

[52]    *See* 2/25/08 Letter from Peterson to Young, Ex. G4 to Welch Decl. Young disputes this statement insofar as he claims he had a good reason for leaving the building – to make an emergency phone call to his family – on at least one occasion. *See* Pl. 56.1 ¶ 57.  Young does not dispute that he did in fact leave the school without permission. *See id.*

11

school year based on lesson observations and letters to Young's personnel file.[53]

In explaining her rating, Blair stated that "despite considerable efforts to help

[Young] improve his teaching as well as comply with DOE and Passages Academy

policies, [Young] showed no improvement during the 2007-2008 school year.

Therefore, I rated him unsatisfactory."[54]

On May 17, 2008, DOE District 79 Superintendent Tim Lisante

recommended that Young's certificate of probation be denied.[55]  On June 17, 2008,

District 79 Superintendent Cami Anderson affirmed Young's discontinuance from

probationary service, thereby ending his employment with the DOE.[56]  Young

appealed both his unsatisfactory rating and his termination to the OAR.[57]

Following a hearing on October 2, 2008 – at which Young was represented by

Madeline Train, an adviser from the United Federation of Teachers ("UFT") – the

Chancellor's Committee unanimously concurred with Young's unsatisfactory

---

[53]     *See* 4/4/08 Young's 2007-2008 Rating Sheet ("2007-2008 Evaluation"), Ex. K1 to Welch Decl.

[54]     Blair Decl. ¶ 20.

[55]     *See* 2007-2008 Evaluation.

[56]     *See* 6/17/08 Letter from Cami Anderson to Young, Ex. K2 to Welch Decl.

[57]     *See* 10/2/08 Chancellor's Committee Report ("Chancellor's Report"), Ex. K3 to Welch Decl.

rating and the decision to discontinue his probationary service.[58]  After reviewing the Chancellor's Report, Superintendent Anderson reaffirmed Young's discontinuance on November 7, 2008.[59]  Anderson's office records indicate that the letter containing Anderson's final decision was sent to Young on November 7, 2008;[60] however, Young avers that he did not receive notice of Anderson's decision until six to eight months after the OAR hearing.[61]

### D. Sexual Harassment Allegations

Young claims that Peterson sexually harassed him and identifies five incidents of sexual harassment.  *First*, while searching for textbooks in a book closet, Peterson said, "[O]h my God, Henry, I can't get out of here.  Come hold my hand.  What would you do if I got stuck her [sic]?" ("Book Closet incident").[62] *Second*, Peterson took over one of Young's classes and "languish[ed] herself in front of the kids, working her hair." ("Classroom incident").[63]  *Third*, while taking

---

[58]     *See id.*

[59]     *See* 11/7/08 Letter from Anderson to Young, Ex. K4 to Welch Decl.

[60]     *See* 4/9/09 E-mail from JoAnn C. Rabot, Deputy Director, OAR, to Margaret Borrelli, Ex. M2 to Welch Decl.

[61]     *See* Young Dep. 3 at 118:6-22.

[62]     Young's Deposition, Excerpt 1 ("Young Dep. 1"), Ex. A to Welch Decl. at 35:10-21.

[63]     *Id.* at 39:16-23.

Young's photo for his ID card, Peterson asked Young whether she looked like a Hollywood star and whether she was beautiful ("Camera incident").[64] *Fourth*, Peterson followed Young down the stairs of the school one day ("Stairs incident").[65] *Fifth*, Peterson asked Young to dinner and asked him to bring her food from his homeland ("Dinner incident").[66]

Young claims that he reported these incidents, but that UFT representatives told him that "sexual harassment in any shape or form is unprosecutable."[67] Young also claims that he complained about sexual harassment by Peterson in a letter to Superintendent Anderson.[68] This letter, however, makes no mention of sexual harassment, and its only mention of Peterson is the following:

> I have had satisfactory ratings until I was sent to Bridges where I encountered a very difficult lady (AP Carolyn Peterson) who

---

[64]     *See id.* at 40:13-22.

[65]     *See id.* at 47:4-16.

[66]     *See id.* at 48:3-19.

[67]     *See id.* at 36:14-24.

[68]     5/23/08 Letter from Young to Anderson, Ex. N1 to Welch Decl. Defendants do not concede that Young ever sent this letter to Anderson. *See* Defendants' 56.1(a) Statement ("Def. 56.1") ¶ 64; Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem.") at 9.

chased me around every nook and corner for insipid reports.[69]

### E. ADA Allegations

On December 7, 2007, Peterson observed that a student in Young's class had written "gang-related material" on the classroom computers.[70] In discussing the incident at a meeting with Blair on December 11, 2007, Young told Blair that he "did not have peripheral vision and had a "'dead man's eye.'"[71] Accordingly, Blair requested a medical examination for Young from the DOE Medical Bureau.[72] Blair's request stated that "[s]tudents in Mr. Young's class have been able to engage in contraband activities as he is unable to see them."[73] Blair asked that the Medical Bureau determine whether Young was fit to teach with his eye impairment.[74]

On January 25, 2008, Dr. Brenda Bennett of the DOE Medical Bureau

---

[69]     5/23/08 Letter from Young to Anderson.

[70]     Log, 12/7/07 at 3.

[71]     Blair Decl. ¶ 21.

[72]     *See* 12/11/07 Letter from Blair to DOE Medical Unit, Ex. I1 to Welch Decl.

[73]     *Id.*

[74]     *See id.*

15

examined Young.[75] Dr. Bennett found that Young had undergone cataract surgery on his left eye one year earlier, that he never completed follow-up treatment, that he had been seeing an ophthalmologist, that vision was improving in his left eye, that vision was perfect in his right eye, and that he had a valid driver's license.[76] Dr. Bennett found Young fit for duty.[77]

DOE personnel policy allows an employee who believes he requires an accommodation to request one either informally through his local "school, district, or office administrator," or formally through the Medical Bureau.[78] Dr. Bennett states that because she found Young fit for duty, she did not tell him that he needed an accommodation.[79] Young contends that Dr. Bennett told him "to request an aide."[80] Regardless, Young did not submit an accommodation request,[81]

---

[75] *See* Report of Dr. Brenda Bennett, DOE Medical Bureau ("Bennett Report"), Ex. I2 to Welch Decl.

[76] *See id.*

[77] *See id.*

[78] 5/1/98 DOE Personnel Memorandum No. 51, "Reasonable Accommodation Requests Under the Americans with Disabilities Act," Ex. I4 to Welch Decl.

[79] *See* Declaration of Dr. Brenda Bennett, DOE Medical Bureau, in Support of Defendants' Motion for Summary Judgment ("Bennett Decl.") ¶ 10.

[80] Pl. 56.1 ¶ 39.

[81] *See* Bennett Decl. ¶¶ 7, 10; Young Dep. 2 at 81:1-6.

16

and Blair states that Young never mentioned his vision impairment to her again.[82]

### F.    Procedural History

On November 7, 2008, Young filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendants discriminated against him on the basis of race, "color and look," and disability and that Defendants retaliated against and sexually harassed him.[83]  On April 24, 2009, the EEOC issued a "Dismissal and Notice of Rights" to Young stating its determination that it was unable to conclude, based on its investigation, whether Defendants violated either Title VII or the ADA.[84]  Young initiated the present action on June 26, 2009.[85]

## III.   LEGAL STANDARD

### A.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

---

[82]     *See* Blair Decl. ¶ 24.

[83]     11/7/08 EEOC Charge, Ex. L1 to Welch Decl.

[84]     *See* EEOC Dismissal and Notice of Rights, Ex. L3 to Welch Decl.

[85]     *See* Compl.

17

party is entitled to judgment as a matter of law."[86] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'"[87] "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[88]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[89] To counter a motion for summary judgment, the non-moving party must do more than show that there is "'some metaphysical doubt as

---

[86]    Fed. R. Civ. P. 56(c).

[87]    *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

[88]    *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)). *Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

[89]    *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). *Accord In re September 11 Litig.*, No. 21 Civ. 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug. 15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation marks omitted).

18

to the material facts,'"[90] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[91] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[92]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[93] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[94] Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party

---

[90]    *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[91]    *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[92]    *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

[93]    *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

[94]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

is entitled to judgment as a matter of law."[95]

The submissions of a pro se party should be held "'to less stringent standards than formal pleadings drafted by lawyers . . . .'"[96] District courts should "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'"[97] These same principles apply to briefs and opposition papers submitted by pro se litigants.[98] Nonetheless, proceeding pro se "does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."[99]

## B.   Employment Discrimination

Under Title VII, it is "unlawful for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such

---

[95]     *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009) (per curiam).

[96]     *Hughes*, 449 U.S. at 9 (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam)).

[97]     *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

[98]     *See Ortiz v. McBride*, 323 F.3d 191, 194 (2d Cir. 2003); *Burgos*, 14 F.3d at 790.

[99]     *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

individual's race, color, religion, sex, or national origin . . . ."[100] "To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part burden-shifting [analysis] laid out by *McDonnell Douglas Corp. v. Green*."[101] "[T]he initial burden rests with the plaintiff to establish a prima facie case of discrimination."[102] A plaintiff meets this burden by showing that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to the inference of discrimination" based on his membership in the protected class.[103]

---

[100]    42 U.S.C. § 2000e-2(a).

[101]    *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). *Accord Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (applying *McDonnell Douglas* framework to race discrimination claim).

[102]    *Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005).

[103]    *Ruiz v. County of Rockland*, — F.3d —, 2010 WL 2541179, at *3 (2d Cir. June 25, 2010) (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)). *Accord Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005). The Second Circuit has noted that the evidence needed to establish a prima facie case is "minimal," *James v. New York Racing Ass'n*, 233 F.3d 149, 153 (2d Cir. 2000), and will be satisfied, for example, by showing that a defendant may have acted with a discriminatory motive, *see Holcomb*, 521 F.3d at 139-41 (finding plaintiff established prima facie case when there was some evidence that employer sought to minimize the presence of African Americans at basketball events), or that a defendant gave preferential treatment to similarly situated employees not of the protected class. *See James*, 233 F.3d at 154.

Plaintiff's proof of a prima facie case "gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a 'legitimate, nondiscriminatory reason' for the challenged employment action."[104] "If the defendant articulates such a reason, 'the presumption of discrimination drops out,' and the plaintiff must 'prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"[105] At this final stage of analysis, courts must "examin[e] the entire record to determine whether the plaintiff could satisfy [his] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'"[106]

## C.    Sexual Harassment

Courts have recognized two forms of sexual harassment that violate Title VII: *quid pro quo* harassment and hostile work environment.[107] *Quid pro quo* harassment occurs "when a plaintiff proves that an action, such as a firing or

---

[104]    *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001)).

[105]    *Id.* (quoting *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001)).

[106]    *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

[107]    *See Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004).

demotion, resulted from a refusal to submit to a supervisor's sexual demands, or that 'an employer demanded sexual favors from an employee in return for a job benefit.'"[108]

To prevail on a sexual harassment claim alleging hostile work environment, a plaintiff must establish:  (1) that the harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment;"[109] (2) that the inappropriate treatment is motivated by plaintiff's gender;[110] and (3) that "a specific basis exists for imputing the conduct that created the hostile work environment to the employer."[111]

To meet the first prong of the test, both objective and subjective elements must be satisfied:  "[N]ot only must the victim [him]self subjectively perceive [the] environment to be abusive, but the misconduct of which a plaintiff complains also must be 'severe or pervasive enough to create an objectively hostile or abusive work environment.'"[112]  To determine whether allegations of abusive

---

[108]    *Min Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 91 (2d Cir. 2002) (quoting *Ellerth*, 524 U.S. at 752).

[109]    *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

[110]    *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).

[111]    *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997).

[112]    *Gratton v. JetBlue Airways*, No. 04 Civ. 7561, 2005 WL 1251786, at *9 (S.D.N.Y. May 25, 2005) (quoting *Petrosino v. Bell Atlantic*, 385 F.3d 210, 221

23

conduct are sufficient to meet the threshold for an objectively hostile environment, courts may consider: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance.[113]

### D. Retaliation

Title VII prohibits retaliation by an employer against its employees in relation to an employment discrimination claim, stating that: "It shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."[114] A prima facie case of retaliation is established when a plaintiff can show:

(2d Cir. 2004)).

[113]   *See Figueroa v. City of New York*, 198 F. Supp. 2d 555, 564 (S.D.N.Y. 2002) (citing *Howley v. Town of Stratford*, 217 F.3d 141, 153-54 (2d Cir. 2000)).

[114]   42 U.S.C. § 2000(e)-3(a). The ADA contains a similar provision. *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.").

24

(1) that he participated in a protected activity known to the defendant; (2) an adverse employment action that disadvantaged him; and (3) a casual connection between the protected activity and the adverse employment action.[115]

## E.    Disability Discrimination

The ADA creates a private right of action for disability-based employment discrimination.[116]  ADA discrimination claims are subject to the *McDonnell Douglas* three-part burden-shifting analysis.[117]  In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show that: (a) his employer is subject to the ADA; (b) he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) he suffered an adverse employment action because of his disability.[118]  Under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise

---

[115]    *See Thomas v. Westchester County Healthcare Corp.*, 232 F. Supp. 2d 273, 279 (S.D.N.Y. 2002) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)).

[116]    *See* 42 U.S.C. § 12112(a).

[117]    *See Iverson v. Verizon Commc'ns*, No. 08 Civ. 8873, 2009 WL 3334796, at *3 (S.D.N.Y. Oct. 13, 2009).

[118]    *See Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004).

25

qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business . . . ."[119]

To establish a prima facie reasonable accommodation case, a plaintiff must show that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [his] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."[120] "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."[121] "If an employer has made reasonable efforts to communicate with an employee, or if the employee causes the interactive process to collapse, an employer will not be liable for failing to make an accommodation under the ADA."[122]

---

[119]    42 U.S.C. § 12112(b)(5)(A).

[120]    *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).

[121]    *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) (citation omitted).

[122]    *Julius v. Department of Human Res. Admin.*, No. 08 Civ. 3091, 2010 WL 1253161, at *10 (S.D.N.Y. Mar. 24, 2010) (quotation marks and citation omitted).

## F.    Title VII Statute of Limitations

"In states such as New York that have an agency with the authority to address charges of discriminatory employment practices, the statute of limitations for filing a charge of discrimination with the EEOC is 300 days."[123]  A plaintiff who fails to file a timely charge with the EEOC is generally barred from bringing a claim of discrimination in federal court,[124] unless he "come[s] forward with evidence of exceptional circumstances that would justify tolling the 300-day filing period."[125]

## G.    Libel:  Notice of Claim Requirement

Section 3813(1) of the New York Education Law ("NYEL") provides, in pertinent part:

> No action or special proceeding, for any cause whatever . . . against the district or any such school shall be prosecuted or maintained against any school district, board of education . . . or any officer of a school district, board of education . . . unless it shall appear by and as an allegation in the complaint or necessary moving papers that a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months after

---

[123]    *Butts v. City of New York Dep't of Hous., Pres. and Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993).

[124]    *Id.*

[125]    *Tsai v. Rockefeller Univ.*, No. 00 Civ. 329, 2002 WL 237843, at *4 (S.D.N.Y. Feb. 15, 2002).

27

the accrual of such claim, and that the officer or body having the power to adjust or pay said claim has neglected or refused to make an adjustment or payment thereof for thirty days after such presentment.[126]

"[A] failure to present a claim [to the proper party] within ninety days of its accrual is a fatal defect."[127] While actions that seek to vindicate the public interest are excepted from this requirement, it is well-settled that section 3813(1) applies to actions that seek the enforcement of private rights.[128]

Under section 3813(2-a), courts may exercise their discretion to extend the time to serve a notice of claim upon reviewing the facts and circumstances.[129] Courts in this district have held that a plaintiff must submit a formal application to the court for leave to file a late notice of claim, and have dismissed claims in the absence of such an application.[130] In

---

[126]   N.Y. Educ. Law § 3813(1).

[127]   *Bloom v. New York City Bd. of Educ.*, No. 00 Civ. 2728, 2003 WL 1740528, at *13 (S.D.N.Y. Apr. 2, 2003). *Accord Kaselaan & D'Angelo Assocs., Inc. v. City of New York*, No. 98 Civ. 7497, 1999 WL 1067857, at *2 (S.D.N.Y. Nov. 23, 1999) ("Notice of claim requirements are strictly enforced, and failure to comply ordinarily results in dismissal.").

[128]   *See Bloom*, 2003 WL 1740528, at *13.

[129]   *See* N.Y. Educ. Law § 3813(2-a).

[130]   *See, e.g.*, *Adler v. South Orangetown Cent. School Dist.*, No. 05 Civ. 4835, 2008 WL 190585, at *16 (S.D.N.Y. Jan. 17, 2008) (dismissing plaintiff's

any event, "[t]he extension shall not exceed the time limited for the
commencement of an action by the claimant against any district or any such
school."[131]   Section 50-i of the New York General Municipal Law requires
that any tort action against a school district or its officers be "commenced
within one year and ninety days after the happening of the event upon which
the claim is based."[132]

## IV.   DISCUSSION

### A.   "Body-Slamming" and Transfer Complaints

Young filed his EEOC Charge on November 7, 2008.  Thus, barring
exceptional circumstances that would warrant tolling, any claims that accrued
before January 12, 2008 – 300 days before November 7 – are time-barred.

Young alleges that he was "body-slammed" by Blair sometime during
his tenure at Project Blum, a Passages Academy site in Brooklyn.[133]  Though the
record does not contain the precise date of the alleged incident, it occurred prior to

---

state law claims where plaintiff failed to timely file a notice of claim pursuant to
section 3813 and had not requested leave to serve a late notice of claim).

[131]   N.Y. Educ. Law § 3813(2-a).

[132]   N.Y. Gen. Mun. Law § 50-i(1)(c).

[133]   *See* Young Dep. 2 at 88:23-24.

29

the 2007-2008 school year.[134]  Young's six transfers, which he claims were

motivated by "spite and hatred," also occurred before September 2007, as Young

taught at the Bridges site for the entire 2007-2008 school year.[135]  As both these

claims accrued before January 12, 2008, and as Young offers no evidence for why

the limitations period should be extended,[136] Young's claims related to the body-

slamming and transfers are time-barred.

    **B.**    **Libel**

        Young claims that a March 25, 2008 letter from Peterson to Blair

constitutes libel.[137]  However, Young provides no evidence to document his

compliance with NYEL section 3813's notice of claim requirements, as he must in

order to bring a state tort claim against the DOE and its employees, Blair and

Peterson.[138]   Moreover, Young commenced this lawsuit on June 26, 2009, more

than one year and ninety days after the alleged libel occurred.  As Young has not

documented his timely compliance with section 3813, and as he did not seek leave

---

    [134]    *See id.* at 89:2-5.

    [135]    *See* Blair Decl. ¶ 6.

    [136]    Nor can this Court, through an independent search of the record, find any evidence to warrant tolling.

    [137]    *See* 3/25/08 Letter from Peterson to Blair.

    [138]    *See* N.Y. Educ. Law § 3813(2).

to file a late notice of claim within the one year and ninety day statutory period for commencing a state tort action,[139] Young's libel claim is dismissed.

## C.   Employment Discrimination

Defendants concede that Young is a member of a protected class.[140] For the purposes of this motion only, Defendants further concede that Young "was qualified for his position as a probationary teacher."[141]  Defendants argue that Young fails to state a prima facie case of discrimination because (1) several of his job-related grievances do not constitute adverse employment actions and (2) Young has produced no evidence showing that any of the actions taken against him "took place under circumstances giving rise to an inference of race or national origin discrimination."[142]  Defendants further argue that they had legitimate, nondiscriminatory reasons for taking adverse action against Young,[143] and that Young cannot show that these reasons are pretextual.[144]  Young has failed to establish a prima facie case of employment discrimination because he cannot show

---

[139]   *See* N.Y. Gen. Mun. Law § 50-i(1)(c).

[140]   *See* Def. Mem. at 4.

[141]   *Id.*

[142]   *Id.*

[143]   *See id.* at 10.

[144]   *See id.* at 14.

31

that any employment actions taken against him occured under circumstances giving rise to an inference of discrimination.

### 1.    Adverse Employment Actions

Young's moving papers contain several allegations that might constitute adverse employment actions under Title VII.  Specifically, Young alleges that Defendants (1) subjected Young to unannounced evaluations;[145] (2) refused to address Young as "Doctor" and told other teachers not to address Young as doctor;[146] (3) denied Young tenure;[147] (4) rated Young "unsatisfactory" for the 2007-2008 school year;[148] and (5) terminated Young's employment.[149]  While Defendants concede that denial of tenure, an unsatisfactory performance evaluation, and termination are adverse employment actions,[150] Defendants deny that the remaining incidents were adverse actions under Title VII.[151]

An adverse employment action is one in which "a plaintiff has

---

[145]    *See* Compl. ¶ 8.

[146]    *See id.* ¶ 7.

[147]    *See id.* ¶ 1.

[148]    *See id.* ¶ 4.

[149]    *See id.* ¶ 3.

[150]    *See* Def. Mem. at 7-8.

[151]    *See id.* at 4-7.

suffered 'a materially adverse change in h[is] employment status' or in the terms

and conditions of his employment."[152]  "To be materially adverse a change in

working conditions must be more disruptive than a mere inconvenience or an

alteration of job responsibilities."[153]  Examples of adverse employment actions

include "'a termination of employment, a demotion evidenced by a decrease in

wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices . . . unique to a particular

situation.'"[154]  However, "such inchoate matters as a plaintiff's embarrassment or

anxiety," generally are not "materially adverse" changes in an employee's

employment status.[155]

      Under this standard, the unannounced evaluations were not adverse

employment actions.  DOE policy states that school administrators "are expected to

visit their teachers' classrooms frequently on an informal basis to provide support

---

[152]    *Kessler*, 461 F.3d at 207 (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)).

[153]    *Id.* (quotation marks and citation omitted).

[154]    *Id.* (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

[155]    *Davis v. City Univ. of New York*, No. 94 Civ. 7277, 1996 WL 243256, at *8 (S.D.N.Y. May 9, 1996). *Accord Jenkins v. Fischer*, No. 01 Civ. 0754, 2002 WL 205674, at *6 (S.D.N.Y. Feb. 8, 2002).

and professional development suggestions."[156]  Thus, even viewed in the light most

favorable to Young, Peterson and Blair had every right to observe Young's classes

unannounced.  Moreover, these unannounced evaluations were not merely

occasions for criticizing Young or placing negative comments in his file; rather,

each walk through or evaluation was followed by conferences in which Peterson,

Blair, and others offered Young assistance in improving his teaching

performance.[157]  Notably, Blair stated that Peterson did not take disciplinary action

following at least six of her walk throughs, in order to give Young an opportunity

to improve.[158]  Based on all the evidence, no reasonable trier of fact could find that

Peterson and Blair's unannounced evaluations were adverse employment actions.

   With respect to Defendants' alleged refusal to either address Young as

doctor or allow other teachers to address him as doctor,[159] Young cannot identify

any way in which these actions materially impacted the terms and conditions of his

---

[156] Teaching for the 21st Century: Guidelines for Annual Performance
Reviews Including School-Based Professional Development for New York City
Public School Teachers, Ex. J3 to Welch Decl. at Appendix A.

[157] *See* Log at 1-6; Blair Decl. ¶¶ 14-19.

[158] *See* Blair Decl. ¶ 18.

[159] The record contains no evidence one way or the other as to whether
Young actually holds a doctorate in education, as he claims.  *See* Compl. ¶ 7.  As
Defendants do not specifically refute this, I assume for the purposes of this Motion
that Young obtained his doctorate.

employment.  Indeed, when asked whether and in what way the failure to address

him as doctor had adversely affected him, Young repeatedly replied that he did not

know.[160]  Although Defendants' refusal to address Young as doctor undoubtedly

embarrassed and angered Young, such subjective harms, without more, were not

materially adverse changes to Young's employment status.  Young thus fails to

establish that Defendants' refusal to address him as doctor constituted an adverse

employment action.

### 2. Circumstances Giving Rise to an Inference of Discrimination

Although denial of tenure, an unsatisfactory rating, and termination do

constitute adverse employment actions, Young fails to make out a prima facie case

of employment discrimination because he offers no evidence that these adverse

actions took place under circumstances giving rise to an inference of

discrimination.[161]  To begin with Young's "denial of tenure" claim, Young argues

---

See *Young* Dep. 2 at 102:17-25; *Young* Dep. 3 at 106:15-25.

[161]     Although I find that the unannounced evaluations and failure to
address Young as doctor are not adverse employment actions, I further note that
Young has not provided any evidence that these actions give rise to an inference of
discrimination.  In particular, Young does not show that he was evaluated or
observed more frequently than other teachers.  In his corrections to his deposition
testimony, Young claimed that other teachers were not informally evaluated, *see*
*Young* Dep. 2 at 89:20, but he offered no further evidence in this regard.
However, even if Peterson did visit Young's classes more often than those of other
teachers, these visits were warranted in order to follow up on her prior conferences

that he deserved tenure because he was initially hired by the DOE in 2003 and

never officially terminated prior to his rehiring in 2005.[162]  Because Young had

therefore technically been employed since 2003, he should have been tenured in

2006, three years into his employment.[163]  Regardless of the merits of this

argument,[164] Young offers no evidence that the failure to grant him tenure occurred

in circumstances that might support an inference of discrimination.  In fact, Young

appears to concede that there was no discriminatory motive driving his tenure

denial, as he attributes his denial of tenure to a "blunder" by the DOE.[165]  Nor does

Young offer any evidence that similarly situated employees not of a protected class

were treated differently, although a showing that "an employer treated plaintiff less

favorably than similarly situated employee outside his protected group" is a

---

with Young by checking to see whether Young was implementing strategies for
improvement and following Passages policies.  *See* Blair Decl. ¶ 18.  Nor does
Young identify similarly situated employees at Passages that Blair and Peterson
did address as doctor.  Young testified that Blair and Peterson addressed a medical
doctor who worked at Bridges as doctor, *see* Young Dep. 2 at 103:9-19, but an
employee would have to, at a minimum, possess a PhD to be similarly situated to
Young.  *See Ruiz*, 2010 WL 2541179, at *5.

[162]     *See* Young Dep. 2 at 70:13-16.

[163]     *See id.*; Compl. ¶ 1.

[164]     Defendants counter Young's argument with evidence showing that
Young only worked as a substitute in 2003 and therefore was not eligible for
tenure.  *See* Ianniello Decl. ¶ 7.

[165]     *See* Young Dep. 2 at 70:13-21.

common and accepted means of raising an inference of discrimination.[166]

   Young also offers no evidence that his unsatisfactory rating or termination raise an inference of discrimination. The record is devoid of evidence that similarly situated employees not of Young's protected class received higher ratings or retained their jobs. In fact, Young's sole evidence that race or national origin played any role in his 2007-2008 rating and termination is a letter from March 2008 in which Peterson advised Blair that students, teachers, and staff had been complaining that Young was emitting a forceful, unpleasant odor, removing his shoes in class, and storing garbage and clothing in the classroom closet.[167] Young maintains that this letter implies that Peterson and Blair considered him an "odious African,"[168] though neither "odious," nor "African," nor any cognates appear in the letter.[169] This letter does not give rise to an inference of discrimination, based on race, national origin, or any other protected status. Because Young can point to no evidence to show that the adverse employment actions taken against him occurred under circumstances giving rise to an inference

---

[166] *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quotation marks and citation omitted).

[167] *See* 3/25/08 Letter from Peterson to Blair. This is also the letter that Young claims is libelous.

[168] *See* Young Dep. 3 at 108:7-20.

[169] *See* 3/25/08 Letter from Peterson to Blair.

of discrimination, Young fails to establish a prima facie case of employment

discrimination under Title VII.[170]

## C.   Sexual Harassment

Young alleges that Peterson sexually harassed him by creating a

hostile work environment.[171]   However, the incidents of sexual harassment that

Young identifies were not "sufficiently severe or pervasive"[172] to create a hostile

working environment.   Although Young may well have subjectively experienced

these incidents as abusive, Young must further establish that Peterson's conduct

created an objectively hostile or abusive environment.[173]   This Young fails to do.

None of the incidents Young describes could rationally be characterized as severe

---

[170]      I note further that Defendants have provided legitimate, nondiscriminatory reasons for "denying" Young tenure, rating him unsatisfactory, and terminating him.   Defendants provide evidence that Young was not eligible for tenure because he was not appointed as a probationary teacher in 2003 due to licensing problems.   *See* Ianniello Decl. ¶¶ 6-7. Defendants provide evidence that Young was rated unsatisfactory and terminated due to poor performance as a teacher and repeated failure to follow Passages Academy policies.   *See* Blair Decl. ¶¶ 8-14; Log at 1-6. Further, Young offers no evidence to show that any of these legitimate, nondiscriminatory reasons were a pretext for discrimination.

[171]      Though the Complaint does not specifically allege a hostile environment, Young does not appear to be making a *quid pro quo* claim.   *See* Compl. Specifically, Young does not allege that the adverse employment actions taken against him occurred because he rejected sexual advances from Peterson. *See id.*

[172]      *Harris*, 510 U.S. at 21.

[173]      *See Gratton*, 2005 WL 1251786, at *9.

38

or pervasive. Peterson never threatened Young in any way, she did not humiliate him in front of others,[174] and her conduct did not interfere with Young's work performance. Indeed, it is unclear how these incidents constitute harassment in any form.[175] Accordingly, Young cannot establish that Peterson sexually harassed him by creating a hostile working environment.[176]

---

[174]   There were no witnesses to several of the incidents Young describes. *See* Young Dep. 1 at 36:11-12 (Book Closet incident); *id.* at 47:24-25 (Stairs incident). It is unclear whether anyone witnessed Peterson ask Young to dinner. *See id.* at 47-49. The Camera incident occurred in the presence of an unidentified cameraman, *see id.* at 45:2-5, while the Classroom incident took place in front of students, *see id.* at 39:22-23.

[175]   When asked why he considered the Book Closet incident sexual harassment Young stated that Peterson "didn't have no business asking me to hold her hand in a dingy room." *Id.* at 36:3-8. With respect to the Camera incident, Young said "I wouldn't ask her, a lady just like that, 'don't I look handsome?'" *Id.* at 44:25-45:1. Young believed the Classroom incident was sexual harassment because he felt that "[s]he was advertising herself to me." *Id.* at 41:10. Young felt the Stairs incident was harassment because it was "stalking," and "[a] man wouldn't do that to a woman without being taken up legally." *Id.* at 47:14-16. Young believed that Peterson asking him to dinner was "a form of asking me for dating," *id.* at 49:13, but could not explain why Peterson asking him to bring her food from his homeland was sexual harassment, *see* Young Dep. 2 at 50:16.

[176]   Young's allegations are also less severe than those contained in other sexual harassment cases in which the Second Circuit has found insufficient evidence of a hostile environment. *See Alfano*, 294 F.3d at 379 (three incidents of sexually explicit comments fell "well below the threshold" for establishing a hostile environment); *Quinn*, 159 F.3d at 768 (commenting on plaintiff's buttocks and deliberately touching her breasts insufficient).

**D.   Retaliation**

Young also fails to raise a triable issue of fact with regard to his retaliation claims.  Young claims that he was retaliated against when OAR Director Caputo did not inform him of the results of his administrative appeal until six to eight months after the OAR hearing.[177]  However, Young does not identify what protected activity he was engaged in that would have led Caputo to retaliate against him, and he testified that he does not know why he believed Caputo's alleged actions were retaliation.[178]  Young also claims he was retaliated against – presumably in the form of his unsatisfactory rating and termination[179] – for filing complaints about Peterson's sexual harassment.[180]  But the DOE does not have any record of complaints of sexual harassment filed by Young, and the one document that Young produced in discovery – a letter he purportedly sent to Superintendent Anderson on May 23, 2008 – does not so much as hint that Young was complaining about sexual harassment.[181]  Because Young cannot show that he was engaged in a protected activity known to his employer, he fails to establish a prima

---

[177]   *See* Young Dep. 3 at 118:11-17.

[178]   *See id.* at 120:3-16.

[179]   The Complaint is not specific on this point.  *See* Compl. ¶ 15.

[180]   *See id.*

[181]   *See* 5/23/08 Letter from Young to Anderson.

40

facie case of retaliation.

### E.    Disability Discrimination

For the purposes of this motion, Defendants concede that the DOE is subject to the ADA and that Young "could perform the essential functions of his job with or without a reasonable accommodation."[182]   Defendants argue that Young nevertheless fails to make out a prima facie case of disability discrimination because Young is (1) not disabled within the meaning of the ADA and (2) no adverse action was taken against Young because of a disability.[183]   Defendants further contend that they did not deny Young a reasonable accommodation.[184]

#### 1.    Disability

Young testified in his deposition that he is "monocular."[185]   The Supreme Court has recognized that monocularity necessarily limits a major life activity – i.e. seeing[186] – and that monocular individuals will "ordinarily" qualify as

---

[182]    Def. Mem. at 19.

[183]    *See id.*

[184]    *See id.* at 21.

[185]    Young Dep. 2 at 72:3-5.

[186]    *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 564 (1999).   In this respect Defendants err in arguing that Young is not disabled because his monocularity does not limit a major life activity. *See* Def. Mem. at 20.   Seeing is the major life activity; the question is the extent to which the monocularity affects seeing. *See Albertson's*, 527 U.S. at 564.

41

disabled under the ADA.[187]  However, the Court has also held that the ADA "requires monocular individuals, like others claiming the Act's protection, to prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial."[188]

Young stated that his monocularity eliminated his peripheral vision[189] and that he could not see on his left side.[190]  Young claims that he needed an aide to compensate for his limited vision,[191] though he also testified that his limited vision did not affect his ability to work as a teacher,[192] that he "always worked and studied with one eye,"[193] and that he completed his degrees with one eye.[194]  Dr. Bennett's report, the only expert assessment of Young's vision contained in the record, found that Young's vision in his left eye was improving, that vision in his right eye was

---

[187]   *See Albertson's*, 527 U.S. at 567.

[188]   *Id.*

[189]   *See* Young Dep. 2 at 76:1-3; *see also* Blair Decl. ¶ 21.

[190]   *See* Young Dep. 2 at 76:23-25.

[191]   *See id.*

[192]   *See id.* at 76:19-23.

[193]   *Id.* at 76:11.

[194]   *See id.* at 76:11-18.

perfect, and that he had a valid driver's license.[195]   The report did not specify the

extent to which Young could see out of his left eye and made no findings as to

Young's peripheral vision.[196]

This evidentiary picture is somewhat confused, but viewed in the light

most favorable to Young, and considering Young's pro se status, I cannot conclude

that Young is not disabled within the meaning of the ADA.   On the one hand,

Young's testimony appears to establish that he experienced significant loss of

vision.   On the other hand, some of Dr. Bennett's findings suggest that Young's

vision was substantially intact.   The question of whether Young's monocular

condition substantially limited his vision raises a disputed issue of material fact as

to whether Young is disabled.

### 2.   Adverse Employment Action Due to Disability

Although I cannot conclude that Young is not disabled under the

ADA, Young nevertheless fails to establish a prima facie case of disability

discrimination because he cannot show that he suffered an adverse employment

action due to his disability.   Young does not offer any evidence that would allow

for an inference that any of the adverse actions taken against him – the refusal to

---

[195]   *See* Bennett Decl. ¶¶ 5-6.

[196]   *See id.*

43

address him as doctor, the tenure denial, the unsatisfactory rating, and his termination – occurred because of his disability.[197]  Accordingly, Young fails to establish a prima facie case of disability discrimination.[198]

### 3.    Reasonable Accommodation

Defendants argue that Young's reasonable accommodation claim must fail because Young plainly did not engage in the ADA's "interactive process."[199] Defendants are correct.  Blair sent Young for a medical evaluation immediately after he first informed her on December 11, 2007 that his vision was impaired.[200] This evaluation, conducted by Dr. Bennett, concluded that Young was fit for

---

[197]    Insofar as Young makes any allegations to tie his disability to the adverse employment actions taken against him, he seems to allege that Defendants began to negatively evaluate him immediately after learning of his monocular vision. *See* Compl. ¶ 3.  Any such claim fails on its face (1) because Defendants did not learn that Young had any sort of sight impairment until December 2007, whereas Defendants had been recording problems with Young's performance since early September 2007, *see* Blair Decl. ¶ 21; Log at 1-6, and (2) following Dr. Bennett's evaluation rating Young fit for duty, *see* Bennett Decl. ¶ 6, and Young's admitted failure to request an accommodation or to even mention his vision again to Blair, *see* Young Dep. 2 at 81:1-4; Blair Decl. ¶ 24, Defendants were under the reasonable impression that Young was not disabled, *see* Blair Decl. ¶¶ 23-24. Defendants cannot have taken adverse action against Young based on a disability of which they had no knowledge.

[198]    Further, Defendants have provided legitimate, non-discriminatory reasons for taking adverse action against Young, and Young cannot show pretext. *See supra* note 179.

[199]    *See* Def. Mem. at 22.

[200]    *See* Blair Decl. ¶ 21.

duty.[201]  Young never requested an accommodation,[202] although he was entitled to

do so, either informally through Passages Academy administrators, or formally

through the DOE Medical Bureau.[203]  Nor did Young mention his vision to Blair

again.[204]  Even viewed in a light favorable to Young, this evidence demonstrates

that Young was responsible for the failure to discuss a reasonable accommodation

with his employer,[205] and it cannot establish that Defendants refused to provide him

---

[201]     *See* Bennett Decl. ¶¶ 5-6.  In his 56.1 statement, Young claims that
Dr. Bennett told him to request an aide.  *See* Pl. 56.1 ¶ 39.  Regardless of whether
Dr. Bennett ever said this, Young admits that he never made the request.  *See*
Young Dep. 2 at 81:1-6.

[202]     *See* Young Dep. 2 at 81:1-4; Bennett Decl. ¶ 7.

[203]     *See* Bennett Decl. ¶ 8.

[204]     *See* Young Dep. 2 at 81:1-4.

[205]     Young's explanation for his failure to request an accommodation or
discuss his vision with his employers is that when he had previously informed his
employer at Automotive High School ("AHS"), where Young worked as a
substitute from September to October 2003, of his disability, the school "grab[bed]
my paycheck and [ran] me off."  Pl. 56.1 ¶ 41; 5/5/10 Handwritten Note
accompanying 10/15/03 Letter from Evaristo Jimenez, Principal, AHS, to Young,
Enclosed with Pl. 56.1.  However, this letter – in which Jimenez replied to Young's
complaints that he had not been paid and that he required accommodation for his
"visual impairment and hearing impairment" – makes clear that Young had not
received a paycheck because he had not addressed problems with his teaching
license.  *See* 10/15/03 Letter from Jimenez to Young.  Moreover, the letter simply
asks Young to provide further information regarding his impairments and states
that Jimenez will "provide appropriate support if warranted."  *See id.*  The letter
provides no reasonable basis by which to conclude that Jimenez took adverse
action against Young upon learning of his disability.

with a reasonable accommodation.  Accordingly, Young cannot establish that

Defendants violated the ADA by denying him a reasonable accommodation.

## V.    CONCLUSION

For the reasons discussed above, Defendants' motion for summary

judgment is granted in full.  The Clerk of the Court is directed to close this motion

(Docket No. 17) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        July 13, 2010
              New York, New York

46

## - Appearances -

**Plaintiff (Pro Se):**

Henry N. Young
1521 Hamilton Avenue
Hamilton, New Jersey 08629
(609) 528-0650

**For Defendants:**

Alicia H. Welch
Assistant Corporation Counsel
New York City Law Department
100 Church Street, Room 2-138
New York, New York 10007
(212) 788-6760